UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:23-cv-60116-FAM

NATASHA LEGROS,

    Plaintiff,

vs.

AMERICAN HEALTH REFORM SOLUTIONS, LLC
d/b/a FLORIDA PLAN ADVISORS, a Florida
Limited Liability Company,

    Defendant.
_____/

## DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT

    Defendant, AMERICAN HEALTH REFORM SOLUTIONS, LLC d/b/a FLORIDA PLAN ADVISORS ("AHRS"), by and through undersigned counsel, under Fed. R. Civ. P. 56, respectfully submits this Memorandum of Law in Support of its Motion for Final Summary Judgment on Plaintiff, NATASHA LEGROS's, amended complaint (ECF No. 5).

    **I.**     **Statement of Material Facts**

    Natasha Legros is a former employee of AHRS. She initially came to AHRS' attention by applying for, and receiving, a junior associate position. Statement of Material Facts ("SOF"), ¶ 1. Her first day of work was July 28, 2020. *Id*. The junior associate position was a full-time "9-to-5" remote position from Monday to Friday. SOF, ¶ 2. The expectations of the junior associate position were simply to pick up the calls of customers interested in purchasing health insurance and routing them to someone who was able (and licensed to) close the deal. SOF, ¶ 2-3. Further, junior associates were expected not to be "on pause" in their remote phone software for too long. Being "on pause" temporarily stopped incoming calls to the software. SOF, ¶ 3. According to Legros, if a junior associate was on pause outside of allowed break times, they were not doing their job. *Id*.

    At its core, the junior associate position sells health insurance, and a license is needed to do so. SOF, ¶ 4. Legros did not pass the licensure exam at any time. SOF, ¶ 6. As such, and in lieu of termination, AHRS moved her to a different position that processed health insurance

applications. *Id*. In this application processing role, Legros helped "push" completed applications to the health insurance marketplace. SOF, ¶ 7. Instead of having the 9-to-5 junior associate hours, Legros now worked 12-hour days, from 9:00 a.m. to 9:00 p.m., with the notable exception of Fridays, where she would only work 9-to-5. SOF, ¶ 8. Eventually, AHRS dissolved the application processing team due to lack of work. SOF, ¶ 9.

After dissolution of the application processing team, approximately December 2020 or January 2021, AHRS moved Legros to a final new role in the HR department. SOF, ¶ 9. She worked under the supervision of Carmel Sanchez and remained in this role until she was terminated. *Id*. In her HR role, Legros was primarily responsible for screening licensed insurance personnel to sell insurance for AHRS, which later expanded to screening all potential employees of AHRS. SOF, ¶ 10. Once she moved into the HR role, Legros' resumed a 9-to-5, 40-hour per week, Monday-through-Friday schedule. SOF, ¶ 11.

The end time of Legros' daily workday was important because of Legros' religious beliefs. Legros is a practicing Seventh Day Adventist. SOF, ¶ 12. One core belief of the Seventh Day Adventists is in the Sabbath, defined as sundown Friday to sundown Saturday. *Id*. During the Sabbath, Seventh Day Adventists do not work. As described by Legros, Seventh Day Adventists work Monday through Friday and reserve the Sabbath to "fast, pray, and spiritually get connected with God." SOF, ¶ 12-13.

Legros testified she has informed every employer since she began working that, due to her observance of the Sabbath, she cannot work during that time. SOF, ¶ 13. This was true for AHRS as well. She told the AHRS representative that interviewed her that "I want you to be informed that I cannot work Friday sundown to Saturday sundown." SOF, ¶ 14. She also testified that she informed Oscar, her supervisor in the junior associates program, about her religious beliefs. *Id*. During the time she was processing health insurance applications, Legros was allegedly scheduled to work during her Sabbath. SOF, ¶ 15. But even if she was scheduled to work during her Sabbath, Legros admitted she could not recall *a single instance* where she physically worked past sundown on Friday or prior to sundown on Saturday. SOF, ¶ 18. Also, after she allegedly complained about this scheduling error, she claims she was "taken off the work schedule" for 2-3 Fridays afterwards. SOF, ¶ 16-17. This was resolved in short order when she was transferred to the HR role in or about December 2020. SOF, ¶ 17.

On or about July 14, 2021, Legros was involved in a motor vehicle accident that occurred after working hours. SOF, ¶ 20. She texted Sanchez that night, letting her know about the accident and sending pictures from the scene. Six days later, she was examined by Dr. Russell Turner. SOF, ¶ 23. He noted in his initial examination report injuries to Legros' neck, shoulders, and back, and that she was not transported to the hospital following her accident. Dr. Turner set forth a treatment plan to start with a physical therapy regimen 3-4x per week, beginning on her next visit. *Id*. Dr. Turner provided a doctor's note to Legros, which stated, "No work from 7/14/2021 thru 7/22/2021 with a late arrival to work today. She is able to return to work this afternoon. This is due to injuries sustained in [the motor vehicle accident]." SOF, ¶ 24. Legros provided this note to Sanchez by email on July 21, 2021. *Id*. She further promised to provide a weekly note regarding her physical therapy, but she never did; she only provided the July 20 doctor's note. SOF, ¶ 31.

Legros can't attribute those absences to FMLA leave. Although she was "considering" using FMLA leave for her physical therapy, she only became eligible on July 28, 2021, one year after she began employment. SOF, ¶ 28. However, Legros never applied for leave under the FMLA at any time. *Id*. She testified that she was *going to* apply, but never did, nor did she tell anyone she intended to apply. *Id*. She did not even take the basic steps of requesting information on the FMLA from anyone at AHRS or even reading the section of the employee handbook regarding FMLA leave. SOF, ¶ 28, 35. Instead, she "went to Google university" to learn about the FMLA because she assumed the FMLA was "standard across the board for all companies in Florida." SOF, ¶ 35.

On August 2, 2021, Legros was terminated in part due to her inconsistent attendance. SOF, ¶ 30. AHRS' time records show that Legros missed extended hours in the middle of the workday several times. SOF, ¶ 31. And other than providing the July 20 note, she did not provide any justification for these extended midday absences. *Id*.

## II.     Memorandum of Law

### A.     Summary Judgment Standard

Summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(a);[1] *Stanley v. City of Sanford, Florida*, 83 F.4th 1333, 1337 (11th Cir. 2023). "[T]he

---

[1]     The 2010 Amendment to Rule 56(a) substituted the phrase "genuine dispute" for the former "'genuine issue' of any material fact."

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" if a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the non-moving party considering his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). A "material" fact is one that "might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015).

### B. Count I and III – Title VII/FCRA Religious Discrimination

Title VII prohibits employers from discriminating against their employees based on their religion. 42 U.S.C. § 2000e-2(a)(1). Religious discrimination claims may be pursued under three theories: disparate treatment, a failure to accommodate religious beliefs, or a hostile work environment. See *Jones v. United Space All., L.L.C.*, 170 Fed. Appx. 52, 55 (11th Cir. 2006). Legros alleges only disparate treatment, since neither "hostile" nor "accommodation" appears in the factual allegations for Counts I or III. Disparate treatment occurs when an employer treats a particular person less favorably than others because of a protected trait. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

Title VII disparate treatment claims can be proven through one of three means: direct evidence; the *McDonnell Douglas*[2] framework; or by showing a "convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Gonzalez v. Real Hosp. Group, LLC*, 2022 WL 706709, at *1 (S.D. Fla. Mar. 8, 2022) (Moreno, J.) (citing *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019)). Claims under Title VII and the FCRA are analyzed under the same framework because the Florida act was patterned after Title VII. *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1300 (11th Cir. 2023). No Florida court has interpreted the Florida statute to impose substantive liability where Title VII does not. *Id*.

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### 1. No direct evidence of discrimination

Direct evidence "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). "Only the most blatant remarks, whose intent could be nothing other than to discriminate ... constitute[s] direct evidence of discrimination." *Masso v. Miami-Dade Cnty.*, 465 F. Supp. 2d 1260, 1264 (S.D. Fla. 2006) (Moreno, J.)*, aff'd,* 247 Fed. Appx. 190 (11th Cir. 2007)*.* Any direct evidence also "must be made by a person involved in the challenged decision." *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F. Supp. 2d 1329, 1342 (S.D. Fla. 2003) (Moreno, J.). Legros does not have any direct evidence of discrimination, nor does she allege the same.

### 2. Cannot prove *prima facie* case under *McDonnell Douglas*

Under the *McDonnell Douglas* standard, Legros must first establish a prima facie case of disparate treatment by showing (1) she "belongs to a protected class," (2) she "was subjected to an adverse employment action," (3) she "was qualified to perform the job in question," and (4) her "employer treated 'similarly situated' employees outside" her class (comparators) more favorably. *Lewis*, 918 F.3d at 1220-21. If she does, the employer must then "articulate a legitimate, non-discriminatory reason or reasons" for its actions. *Id.* Then, if the employer does, the plaintiff must show that the proffered reasons were merely pretext and the employer's real reason was retaliation. *Id.* The burden of proof, at all times, lies with the plaintiff. *Id.*

For purposes of summary judgment, only the second and fourth prongs are disputed. For the second prong, an adverse employment action is conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives them of employment opportunities, or adversely affects their status as an employee. *Nettles v. LSG Sky Chefs*, 211 F. App'x 837, 839 (11th Cir. 2006). Termination is obviously an adverse employment action, but a schedule change generally is not. See *Jackson v. Hall Cnty. Gov't*, 518 F. App'x 771, 773 (11th Cir. 2013) (per curiam) (changes to shift assignments or work schedules are insufficient to establish an adverse employment action); *Hall v. Dekalb Cnty. Gov't*, 503 Fed. Appx. 781, 787 (11th Cir. 2013) ("In the majority of instances, an employee alleging a change in work assignments, without any tangible harm, will be outside the protection provided by Title VII's anti-discrimination clause.").

When specifically asked what she contended was discriminatory, Legros testified that AHRS scheduled her to work on Saturdays, in violation of her religious beliefs. SOF, ¶ 15-16. But she admitted that she never once worked in violation of those beliefs. SOF, ¶ 18. She could not recall a single Sabbath she worked while employed by AHRS. *Id*. Even if the act of scheduling someone to work in violation of their religious beliefs constitutes an adverse employment action—regardless of whether they actually work during that scheduled time—Legros testified there were only "two to three weeks" where she was removed from working on Fridays. SOF, ¶ 17. Once she was placed in the HR department, Legros worked the rest of her tenure at AHRS without being scheduled on the Sabbath—a period of 7 to 8 consecutive months. *Id*. No adverse employment action was taken against her because of her religious beliefs.

For the fourth prong, Legros does not have a similarly situated comparator, and filed her case without having knowledge of one. Comparators should be "similarly situated in all material respects." *Lewis*, 918 F.3d 1213, 1218, 1228. The comparator and the plaintiff must be "sufficiently similar, in an objective sense" so that they "cannot reasonably be distinguished" from each other. *Id*. Ordinarily, a similarly situated comparator will: (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy; (3) ordinarily have had the same supervisor; and (4) share the plaintiff's employment or disciplinary history. *Id*. at 1227. Legros was unaware of anyone's religious preferences at AHRS. SOF, ¶ 19. She revealed that she never had any reason to believe anyone else was treated better than her based on religion. "Q. Do you have any belief that other people were treated better than you based on their religious background? ***A. Not based on their religious background, no***." *Id*. This admission sinks her religious discrimination claims.

### 3. No pieces of a convincing mosaic

The Eleventh Circuit has stated the "convincing mosaic" is not a "legal test of any kind." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). It is an instruction to the courts to consider "the totality of a plaintiff's circumstantial evidence on summary judgment," which may include: (1) suspicious timing or ambiguous statements, (2) systematically better treatment of "similarly situated" employees, and (3) pretext. *Id.* (citing *Lewis*, 934 F.3d at 1185). At bottom, the mosaic must still be enough to allow a reasonable jury to infer but-for causation. *Id*. Since Legros admitted she did not believe anyone was treated better than her based on their

religious background, there are no mosaic pieces for her to assemble.

### C. Counts V and VII – ADA/FCRA Disability Discrimination

Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, Legros must show that she (1) is disabled, (2) is a "qualified individual," and (3) was discriminated against *because of* her disability. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023); *Gonzalez*, 2022 WL 706709, at *2. Disability discrimination claims under the FCRA are analyzed using the same framework as ADA claims. *Gonzalez*, 2022 WL 706709, at *2; see also *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (the FCRA is simply the "Florida analog" of the ADA); *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022) (Rehabilitation Act cases also precedent for ADA Title I claims).

Disability discrimination claims in employment typically fall into two buckets: disparate treatment claims and disparate impact claims.[3] *Equal Employment Opportunity Comm'n v. Dolgencorp, LLC*, 2022 WL 2959569, at *4 (N.D. Ala. July 26, 2022) (citing *Raytheon Co.*, 540 U.S. at 52). It also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). Again, disparate treatment is when an employer "simply treats some people less favorably than others" because of a protected characteristic, here a disability. *Dolgencorp, LLC*, 2022 WL 2959569, at *4 (citing *Raytheon*, 540 U.S. at 52). The "because of" requirement speaks to the employer's *intent* to discriminate against an employee based on a protected trait. *Id*.

#### 1. No prima facie case of disability discrimination.

Under the ADA, the term "disability" means: "(A) a physical or mental impairment that **substantially limits** one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102 (***emphasis added***). An impairment is a disability "if it substantially limits the

---

[3] It does not appear as if disparate impact has been alleged.

ability of an individual to perform a major life activity as compared to most people in the general population." *Dykstra v. Florida Foreclosure Attorneys, PLLC*, 183 F. Supp. 3d 1222, 1230 (S.D. Fla. 2016). A substantial limitation on a major life activity should be "considerable," but not necessarily an "utter inability." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999). No impairment constitutes a disability *per se*. *Id*. at 566.

"Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2); see also 29 C.F.R. § 1630.2(i). Whether an impairment substantially limits a major life activity includes "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

Legros was completely unable to define what her "disability" was. By way of interrogatory, she testified about generic injuries to her neck, shoulder, and hips. SOF, ¶ 20. But not all physical impairments are "disabilities" within the purview of the ADA. *Albertson's, Inc.*, 527 U.S. at 565.; Instead, these physical impairments must substantially limit a major life activity. *Id*. at 566. On that note, Legros testified that she told Sanchez only that she could stand or sit for 30 to 40 minutes at a time before needing to switch positions.  SOF, ¶ 27.

Courts have routinely held that "a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks… [does] not constitute a disability under the ADA." *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000). In *Rossbach v. City of Miami*, 371 F.3d 1354, 1358-59 (11th Cir. 2004), plaintiffs' limited abilities to stand or sit for extended periods of time was not a "substantial" limitation. In *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 186 (3d Cir. 1999), a plaintiff was not disabled when they could stand for 50 minutes unassisted and otherwise needed hourly breaks from standing or walking. In *Wilson v. Wal-Mart Stores, Inc.*, 2008 WL 11336703, at *9 (M.D. Fla. Nov. 10, 2008), a plaintiff that "[could not] stand for more than 30 minutes, sit for more than one hour, or walk for more than 15 minutes at a time without risking dizziness and/or falling" was not significantly limited in those major life activities when compared to the average person. And in *Amos v. Hertz Transporting Inc.*, 2006

WL 229499, at *8 (N.D. Ga. Jan. 31, 2006), the court held it was not a *substantial* limitation on the plaintiff "to change position or take a break for five minutes every forty-five to sixty minutes of continuous sitting or standing…" Here, Legros' testimony is essentially identical to the *Amos* plaintiff. She testified that she could only sit or stand for 30-40 minutes at a time. SOF, ¶ 27. Legros has failed to show that she was "substantially limited" in standing or sitting, as a matter of law, and likewise, has failed to establish that she was "disabled" within the meaning of the ADA and FCRA.

### 2. Legros did not establish a record of impairment by providing a single doctor's note to AHRS.

A plaintiff has a "record of a disability" claim if they "[have] a history of, or [have] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (citing 29 C.F.R. § 1630.2(k)(1)). A plaintiff relying upon a record of impairment theory must show a history of a condition that substantially limits a major life activity. *Goldsmith v. Jackson Mem'l Hosp. Pub. Health Tr.*, 33 F. Supp. 2d 1336, 1341 (S.D. Fla. 1998), aff'd sub nom. *Goldsmith v. Jackson Mem'l Hosp.*, 198 F.3d 263 (11th Cir. 1999) (citing *Burch v. Coca–Cola Co.*, 119 F.3d 305, 321 (5th Cir. 1997)).

Merely having a history of treatment does not, by itself, establish that a major life activity was substantially limited. In *Goldsmith*, an alcoholic doctor who had "the usual limitations caused by alcoholism" was not able to show a *substantial* limitation on any major life activity. *Goldsmith*, 33 F. Supp. 2d at 1342; see also *Burch*, 119 F.3d at 322 (same). Even medical records do not, by themselves, create a record of a disability. *Carper v. TWC Services, Inc.*, 820 F. Supp. 2d 1339, 1353 (S.D. Fla. 2011); see also *Reis v. Universal City Dev. Partners, Ltd.*, 442 F. Supp. 2d 1238, 1248–49 (M.D. Fla. 2006) (plaintiff's actual hospitalization, by itself, did not create a record of an impairment). Here, the only document ever provided to AHRS was a solitary doctor's note by email on July 21, 2021. This is the same fatal flaw that doomed the *Carper* plaintiff. In *Carper*, the plaintiff failed to show a record of impairment with a single doctor's note. 820 F. Supp. 2d at 1354.

Further, an employee must prove the employer relied on that record of impairment to decide there was a substantially limiting disability. *Carper*, 820 F. Supp. 2d at 1354 (citing

*Hilburn*, 181 F.3d at 1229). In other words, the documents forming the record must be in the employer's possession. *Id*. (summary judgment warranted for defendant because no record evidence it ever possessed plaintiff's medical records). This is common sense; if the employer is not aware of the employee's medical records' contents, it cannot rely on them when deciding to terminate. Here, Legros' single doctor's note that she provided to AHRS cleared her to return to work immediately. SOF, ¶ 24. This note certainly did not provide enough information for AHRS to conclude Legros was disabled, particularly when she was cleared to return to work immediately.

> **3. No one at AHRS regarded Legros as disabled because she only provided her supervisor vague descriptions of her condition.**

An individual is regarded as "disabled" if her employer perceives her as having an ADA-qualifying disability. See *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004). A plaintiff is "regarded as" having a disability under the ADA if she:

> (1) Has a physical or mental impairment that does not substantially limit major life activities ***but is treated by the covered entity as constituting such limitation***;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only ***as a result of the attitudes of others*** toward such impairment; or
>
> (3) Has [no such impairment] but ***is treated*** by a covered entity ***as having a substantially limiting impairment***.

*Shepard v. United Parcel Serv., Inc.*, 470 Fed. Appx. 726, 729 (11th Cir. 2012). (***emphasis added***).

"What matters…is whether the [employer] perceived [the plaintiff] as impaired, not whether he was actually impaired." *Forsyth v. Univ. of Alabama, Bd. of Trustees*, 2021 WL 4075728, at *4 (11th Cir. Sept. 8, 2021) (citing *Carruthers*, 357 F.3d at 1216). But "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999). "As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual." *Hilburn*, 181 F.3d at 1230.

AHRS could not have believed that Legros had any disability, nor did they have anything on which to perceive her as disabled. Legros testified that she told Sanchez about her motor vehicle

accident the same night it happened. SOF, ¶ 20.  Legros further told Sanchez that she could not sit or stand for very long because her neck and shoulders were hurting and she was in pain. SOF, ¶ 21. That was the most she told Sanchez about her condition. *Id*. Legros "didn't really disclose a lot of her medical information" to AHRS management because she "tried not to be so personal at work." *Id*. At best, AHRS was aware Legros had a temporary physical impairment, not a disability.

Further, the Eleventh Circuit has held that potential future impairments do not qualify as "perceived" disabilities under the "regarded as" disability prong of the ADA. *Equal Employment Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305 (11th Cir. 2019). When asked if she was ever diagnosed by anyone to have a disabling condition, Legros testified, "They told me what my long-term ailments *would have been*, but I don't know if I would consider that to be a disability." SOF, ¶ 25. Thus, Legros admitted those long-term ailments are simply potential future impairments that have yet to materialize and, thus, not a "perceived" disability.

Finally, even if Legros was perceived to have a disability, Legros has not provided any evidence that anyone at AHRS *negatively* remarked on it. In fact, the opposite; Legros testified that her team was "very empathetic, very understanding" of the pain she had. SOF, ¶ 21. The attitudes of others at AHRS were certainly not discriminatory.

> **4. Legros admitted she did not request a reasonable accommodation and, even if she did, it was not informative enough to trigger AHRS' duty to respond.**

To prevail on a failure to accommodate claim under both the ADA and FCRA, Legros must demonstrate (1) she was a qualified individual with a disability; (2) ***she made a specific request for a reasonable accommodation***; and (3) her employer failed to provide a reasonable accommodation, or engage in the requisite interactive process in order to identify a reasonable accommodation. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020). Even if an individual is legally disabled, an employer's obligation to provide an accommodation or engage in an interactive process with the employee "is not triggered unless ***a specific demand for an accommodation*** has been made." *Id*. "Where the employee fails to identify a reasonable accommodation, the employer has no affirmative duty to engage in an 'interactive process' or to show undue hardship." *Spears v. Creel*, 607 F. App'x 943, 948 (11th Cir. 2015).

Recently, under the Rehabilitation Act, the Eleventh Circuit clarified what a specific demand for accommodation looks like. See *Owens*, 52 F.4th 1327. First, "an employee must

provide at least some information about how a physical or mental condition limits her functioning." *Id*. at 1335. She "must identify—at least in broad strokes—the limitations her mental or physical condition imposes." *Id*. Next, "an employee must provide her employer enough information to assess how her proposed accommodation would help her overcome her disability's limitations." *Id*. Specifically, "an employee must link her disability to her requested accommodation by explaining how the requested accommodation could alleviate the workplace challenges posed by her specific disability." *Id*. "The bottom line is that employees must give employers enough information to respond effectively to an accommodation request." *Id*. at 1335.

Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice" of its accommodation duties. *Owens*, 52 F.4th at 1336. In *Owens*, a plaintiff's statement that she experienced "childbirth-related complications," requiring "two blood transfusions" was insufficient to identify what her "disability" was. *Id.* at 1337. In *Okafor v. Infuserve Am., Inc.*, 2023 WL 3563600, at *12-13 (M.D. Fla. Mar. 6, 2023), a plaintiff's provision of a medical note about working remotely due to being immunocompromised was insufficient.

Even if Legros was a "qualified individual with a disability," she never made a specific demand for a reasonable accommodation as a matter of law. In particular, she did not disclose any disability to AHRS, and as such, she did not link her disability to her proposed accommodations. She told Sanchez she would need "a high desk and things for her chair" because "her back was killing her." SOF, ¶ 22. She never put in writing (text or email) that she had a disability, even to Sanchez. SOF, ¶ 25. She only told Sanchez that she had a hard time sitting and standing for a very long time. SOF, ¶ 21. Collectively, none of this is sufficient, as a matter of law, to be a specific demand for a reasonable accommodation.

> **5. AHRS articulated legitimate, nondiscriminatory reasons for Legros' termination, and Legros has no record evidence of alleged pretext.**

If Legros proved her *prima facie* case—which she cannot—AHRS offered legitimate business reasons why she was terminated. If an employee establishes a *prima facie* case of disability discrimination, the burden shifts to the employer to advance a "legitimate, nondiscriminatory reason for terminating the employee." *Lewis*, 918 F.3d at 1221. This is a low bar; the employer's burden is a "burden of production that can involve no credibility assessment." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). An employer may

terminate an employee for a good reason, a bad reason or no reason at all, as long as it is not for an illegal reason. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). This is because federal courts do not sit as a "super-personnel department" to "second-guess the wisdom of an employer's business decisions." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

Violations of an employer's attendance policy may constitute a legitimate reason. *Corbin v. Town of Palm Beach*, 996 F. Supp. 2d 1275, 1287 (S.D. Fla. 2014) (citing *Odum v. Government Employees Ins. Co.*, 2009 WL 2134918, at *4 (M.D. Fla. July 13, 2009) (violation of attendance policy and dishonesty are legitimate reasons for termination)). That is the case here. AHRS' time records show that Legros missed extended hours *in the middle of the workday* several times. SOF, ¶ 31. She further promised to provide a weekly note regarding her physical therapy, but she never did; she only provided the July 20 doctor's note. *Id*.

At this point, Legros must prove that the proffered reasons were merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221. She can prove this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). The evidence must permit a reasonable factfinder to conclude that the employer's reasons were not the real reasons for the adverse employment decision. *Id*.

Based on the above record evidence, Legros is unable to do so. She was not a qualified individual because her physical injuries were not a disability, as a matter of law. Further, she only told Sanchez vague details about her physical condition, certainly not enough to perceive her as disabled. She also never experienced any negative commentary or perceptions from her coworkers.

### D. Counts II, IV, VI, and VIII – Retaliation under Title VII (II), the ADA (VI), and the FCRA (IV and VIIII)

To allege a prima facie case of retaliation, Legros must show (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Gogel v. Kia Motors Mfg. of*

*Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020).[4] Ultimately, the employee's burden is to prove that "the desire to retaliate was the but-for cause" of the challenged action. *Harris*, 82 F.4th at 1305.

For the first prong, protected activities can consist of "opposing unlawful employment practices or participating in making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing regarding an unlawful employment practice." *Shedrick v. Dist. Bd. of Trustees of Miami-Dade Coll.*, 941 F. Supp. 2d 1348, 1367 (S.D. Fla. 2013).

For the second prong, "adverse employment actions" are those that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Davis v. Legal Services Alabama, Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021). They include "tangible employment actions," which are those actions "that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Id*.

For the third prong, to establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse act were at least somewhat related and in close temporal proximity. *Grier v. Snow*, 206 Fed. Appx. 866, 868 (11th Cir. 2006). "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1120 (11th Cir. 2004).

### 1. Religious retaliation

Regarding Legros's claims of religion-based retaliation, for purposes of summary judgment, AHRS does not contest the first prong of protected activity. However, there was no adverse employment action related to her religious protected activity. She testified she was taken off the work schedule for 2-3 Fridays, and that AHRS "making it complicated to use…PTO when my child was sick." SOF, ¶ 32. For the latter, she described one particular incident where she used PTO for one day off but was not paid for it until one week later. *Id*. A one-week delay in payment for *successful* PTO use cannot, as a matter of law, be an adverse employment action. For the former, minor variances in scheduling are not an adverse employment action. See *Clark v. S.*

---

[4] The Court evaluates ADA and FCRA retaliation claims under the Title VII standard. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021); *Russell v. City of Tampa*, 737 F. App'x 922, 923 (11th Cir. 2018).

*Broward Hosp. Dist.*, 601 Fed. Appx. 886, 893 (11th Cir. 2015) (receiving two fewer shifts than requested over a one-month period not an adverse employment action).

Even if that constitutes an adverse employment action, there is no causal connection. "Very close" temporal proximity (less than 3 months) between a protected activity and an adverse action can create an inference of causation. *Walker v. Sec'y, U.S. Dept. of Air Force*, 518 Fed. Appx. 626, 628 (11th Cir. 2013) (three-to-four months between protected conduct and adverse employment action insufficient to establish causation). But Legros admitted the scheduling issue was resolved quickly and she worked for another 7-8 months without a single scheduling issue. SOF, ¶ 17. The temporal distance destroys causal connection.

### 2. Disability retaliation

Regarding Legros's claims of disability-based retaliation, she cannot establish a protected activity. She testified that AHRS failed to provide her additional working hours to make up for her need to attend physical therapy. SOF, ¶ 33-34. This is another minor scheduling variance that is not an adverse employment action. In fact, AHRS could not give Legros any additional hours due to her position in HR, since "if Carmel left for the day or Natalie left for the day, there was not much for me to do." SOF, ¶ 33.

More importantly, she testified about AHRS' alleged failure to provide her with a standing desk or chair pillows. But Legros admitted *she never asked for either* from <u>anyone</u> at AHRS, including Sanchez. Although she said she would need "a high desk and things for my chair and stuff like that because my back is killing me," she testified that she never asked Sanchez for these items. SOF, ¶ 33. Beyond that, she didn't so much as *tell* anyone else at AHRS that she needed these items. SOF, ¶ 29.

Further still, the Eleventh Circuit has held that an employer's failure to accommodate is not "protected activity" for retaliation because it is neither opposition to an unlawful practice nor participation in a charge. *White v. Elegant Beauty Supplies, #49, Inc.*, 2023 WL 3711005, at *4 (S.D. Fla. May 2, 2023) (citing *Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001)); see also *Calvo v. Walgreens Corp.*, 340 Fed. Appx. 618, 625 (11th Cir. 2009) (refusing to address "retaliation" claims that were based on simple refusals to accommodate). In *Lucas*, 257 F.3d at 1261, the Eleventh Circuit held that a plaintiff who alleged a failure to reasonably

accommodate and the failure to engage in the interactive process did not state a distinct claim for retaliation because it "merely reclothe[d] [his] ADA discrimination claim."

Even if a request for a reasonable accommodation does constitute protected activity for retaliation, those protections only reach individuals who "explicitly or implicitly communicate[ ] a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). Legros did not explicitly or implicitly communicate to Sanchez—the only person she told about the standing desk and chair pillows—that she believed she was being discriminated against due to her alleged disability. SOF, ¶ 29. Instead, she told Sanchez she would be purchasing the items herself. *Id*. This statement does not imply that AHRS' actions or inactions were unlawful.

### E. Counts IX and X – Interference and Retaliation under the FMLA

The FMLA provides covered employees 12 workweeks of leave during any 12–month period "because of a ***serious health condition*** that makes the employee ***unable to perform the functions of the position of such employee***." 29 U.S.C. § 2612(a)(1)(C) and (D). It is unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" that right to such medical leave. 29 U.S.C. § 2615(a).

Under section 2615(a), there are two types of claims: FMLA interference and retaliation. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001). An FMLA interference claim requires a plaintiff to demonstrate that "she was entitled to an FMLA benefit and her employer denied her that benefit." *Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020). She must show that (1) she was entitled to a benefit under the FMLA; (2) her employer denied her that benefit; and (3) "demonstrate harm, or prejudice, resulting from the employer's interference with her exercise (or attempted exercise) of an FMLA benefit." *Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1121 (11th Cir. 2023); *Wascura*, 257 F.3d at 1248. The elements of an FMLA retaliation claim are the same as the Title VII, ADA, and FCRA claims. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010).

#### 1. Legros could perform the essential functions of her job.

Of course, to assert either an interference or retaliation claim, "[a]n employee ***must actually qualify*** for FMLA leave." *Okafor*, 2023 WL 3563600, at *5 (citing *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1166 (11th Cir. 2014)); *Pereda*, 666 F.3d at 1272 ("In order to receive FMLA

protections, one must be both eligible, meaning having worked the requisite hours, and entitled to leave, meaning an employee has experienced a triggering event…"). To be eligible, the employee must have been employed for at least twelve months by the employer and worked at least 1,250 hours during the previous twelve-month period. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1247 (11th Cir. 2015) (citing 29 U.S.C. § 2611(2)(A)).[5]

Legros was not eligible for FMLA leave until July 28, 2021. SOF, ¶ 28. Thus, if the *only* requirement for FMLA eligibility was 12 months of employment and 1,250 hours worked, Legros was theoretically eligible for the FMLA from July 29-August 2, 2021. But the FMLA only applies to employees who are **unable to perform the functions of the position of such employee**. 29 U.S.C. § 2612(a)(1)(D). Legros admitted she was able to perform the essential functions of her job with her standing desk and a chair pillow. SOF, ¶ 29. Because she admitted she could perform the essential functions of her job, she did not qualify for leave under the FMLA. Failure to qualify for FMLA leave means her interference and retaliation claims both fail.

## 2. Legros did not have a "serious medical condition."

Interference and retaliation also require the employee to establish a **serious health condition**. *Okafor*, 2023 WL 3563600, at *5 (citing *Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003)). A "serious health condition" means "an illness, injury, impairment or physical or mental condition that involves <u>inpatient care</u> as defined in § 825.114 or <u>continuing treatment by a health care provider</u> as defined in § 825.115." 29 U.S.C. § 2611(11); 29 C.F.R. § 825.113.

Inpatient care means "an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114. Legros cannot meet the standard for inpatient care because she was not hospitalized overnight. She listed a chiropractor as the only "hospital, hospice, or residential medical care facility" where she received treatment. SOF, ¶ 23. That chiropractor noted Legros "*did not* go to the hospital for evaluation." *Id*.

"Continuing treatment" likewise requires a period of "incapacity"—the inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery from it. 29 C.F.R. § 825.113 and § .115(a). Legros was not "incapacitated"

---

[5] AHRS does not contest that Legros worked the requisite hours for FMLA eligibility.

because she attended work on a regular basis from July 14-31, 2021, albeit with some lengthy mid-day absences. SOF, ¶ 31. Thus, even if Legros had a physical condition, it was not "serious" as required for an FMLA interference or retaliation claim.

### 3. Legros never engaged in protected activity.

For her FMLA retaliation claim, Legros admitted she never engaged in protected activity. Prior to July 28, she was not eligible for FMLA leave. SOF, ¶ 28. She never applied for FMLA leave after she became eligible. *Id*. She never told anyone that she intended to apply for FMLA leave. *Id*. And she never requested any information on the FMLA from AHRS. *Id*. Indeed, Legros did not even review the information on the FMLA that AHRS *had already provided to her*. When she was hired, Legros received an employee handbook from AHRS. SOF, ¶ 35. She "skimmed" the policies in the handbook. Inside the handbook were detailed policies related to the FMLA and non-discrimination. However, she specifically denied reviewing the section on the FMLA. Instead, she "went to Google university" to learn about the FMLA because she assumed the FMLA was "standard across the board for all companies in Florida." *Id*. Stated plainly, there is nothing that Legros testified to that can constitute a protected activity, as a matter of law.

### F. Conclusion

At bottom, Legros alleges three types of claims: (1) discrimination; (2) retaliation; and (3) interference under the FMLA.

For the discrimination and retaliation claims, Legros has outright failed to show a prima facie case of discrimination, be it related to disability or religion. Specific to her religious discrimination claim, the only claimed adverse employment action (removing Friday from her schedule) did not occur over the final 7-8 months of her employment. Specific to her disability discrimination claim, she was outright unable to describe what her disability was. Even if she was a qualified individual with a disability under the ADA, she never experienced any negative treatment by or commentary from anyone at AHRS. Finally, to the extent she needed a reasonable accommodation for her alleged disability, she admitted she never requested one, including from her direct supervisor, Sanchez. She also could not identify a single comparator for either class of discrimination claim, primarily because, at the time this lawsuit was filed, she had no knowledge of any of her coworkers' religious backgrounds or disabilities.

For her FMLA claims, the FMLA only protects those with serious health conditions that render them unable to perform the essential functions of her job. Legros admitted she could perform the essential functions of her job. Since an employee must actually qualify for FMLA leave to assert an interference claim, it fails. For the FMLA retaliation claim, because Legros did not qualify for FMLA leave, she cannot assert a retaliation claim. Further, she admitted she was planning to apply for leave, but didn't actually do so. She also never told anyone at AHRS she had planned to do so.

This Court should grant final summary judgment in favor of AHRS on all counts in the amended complaint.

Dated: November 9, 2023
      Boca Raton, FL

Respectfully submitted,

**Alex B.C. Ershock**
ROBIN I. FRANK, ESQ.
Florida Bar No. 0649619
E-Mail: RIF@PBL-Law.com
ALEX B.C. ERSHOCK, ESQ.
Florida Bar No. 100220
E-Mail: ABE@PBL-Law.com
PADULA BENNARDO LEVINE, LLP
3837 NW Boca Raton Blvd., Suite 200
Boca Raton, FL 33431
Telephone: (561) 544-8900
Attorneys for Defendant