UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:23-cv-60116-FAM

NATASHA LEGROS,

    Plaintiff,

vs.

AMERICAN HEALTH REFORM SOLUTIONS, LLC
d/b/a FLORIDA PLAN ADVISORS, a Florida
Limited Liability Company,

    Defendant.
_____/

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

    Defendant, AMERICAN HEALTH REFORM SOLUTIONS, LLC d/b/a FLORIDA PLAN ADVISORS, by and through undersigned counsel, under Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, hereby file its Statement of Material Facts, to which Defendant contend there exists no genuine dispute:[1]

    1.    Through an advertisement she saw on Indeed, Plaintiff, Natasha Legros, first applied for a junior sales associate position with AHRS sometime before July 2020. Her first day of employment was July 28, 2020. Deposition of Natasha Legros, [36:17-37:13; 39:4-6], attached as Exhibit A.

    2.    As a junior associate, Legros would receive calls from people looking to buy health insurance. She would deliver a sales pitch to try to get them through the door, and then transfer them to somebody else that could be able to close. The junior associate position was a full-time "9-to-5" position from Monday to Friday. Ex. A, [39:9-15; 53:10-22].

    3.    The junior associate position was a remote position. AHRS' IT department installed software on Legros' personal computer that allowed her to receive incoming calls. The expectations of the junior associate position were simply to pick up calls and not be "on pause"

---

[1]    References to depositions will be marked as [page:line – page:line], or [page:line-line], if the testimony is on the same page.

Page **1** of **7**

too long. Being "on pause" temporarily stopped incoming calls to the software. In other words, if a junior associate was on pause outside of allowed break times, they were not doing their job. Ex. A, [39:9-40:4; 40:13-41:7; 44:9-45:4].

4. At its core, the junior associate position sells health insurance, and a license is needed to do so. AHRS' advertisement stated it would help the junior associate get their licensure, which Legros stated was a reason she applied. Ex. A, [37:14-38:1].

5. While she was employed as a junior associate, Legros had to study and work at the same time. She was expected to pass the licensure exam to sell health insurance prior to the "open enrollment" period began in October. AHRS would try and find an alternate position for any junior associate who was unable to pass the licensure test. Ex. A, [38:2-39:3; 40:9-12; 45:5-14].

6. Legros did not pass the licensure exam the first time she took it, or at any time. As such, she was moved to a different position that processed health insurance applications. Ex. A, [45:23-46:13].

7. In her application processing role, Legros helped "push" completed applications to the health insurance marketplace. Her only job duty in this role was to "submit[], submit[], submit[], submit[]" applications. Ex. A, [47:8-48:6].

8. Legros' hours changed when she was placed in the application processing role. Instead of having the 9-to-5 junior associate hours, Legros now worked 12-hour days, from 9:00 a.m. to 9:00 p.m., with the notable exception of Fridays, where she would only work 9-to-5. Ex. A, [54:6-55:7].

9. Eventually, the applications AHRS needed to process slowed down, to the point where the application processing team was dissolved. Around that time, approximately December 2020 or January 2021, Legros was transferred to the HR department to work under the supervision of Carmel Sanchez. She remained in this role until she was terminated. Ex. A, [48:7-49:4; 55:20-56:1].

10. In her HR role, Legros was primarily responsible for screening licensed insurance personnel to sell insurance for AHRS, prior to offering them employment. Her duties then expanded to screening anyone who wanted employment at AHRS. The only other duties she performed were spreadsheet data entry and timesheet entry corrections. Ex. A, [49:6-50:8; 50:15-51:15; 52:20-24].

11. Once she moved into the HR role, Legros' resumed a 9-to-5, 40-hour per week, Monday-through-Friday schedule. Ex. A, [55:8-15].

12. The end time of Legros' daily workday was important because of Legros' religious beliefs. Legros is a practicing Seventh Day Adventist. One core belief of the Seventh Day Adventists is that they do not work during the Sabbath. As described by Legros, Seventh Day Adventists work Monday through Friday and reserve the Sabbath to fast, pray, and spiritually get connected with God. Ex. A, [57:4-58:2; 59:15-19].

13. The Seventh Day Adventists' Sabbath begins Friday at sundown and ends Saturday at sundown. "Sundown Friday" started at 5:01 p.m., but generally, any time prior to 7:00 p.m. was compliant with her beliefs. Legros testified she has informed every employer since she began working that, due to her observance of the Sabbath, she cannot work during that time. Ex. A, [59:15-19; 62:10-63:4; 101:6-11].

14. AHRS was no exception to Legros's Sabbath discussion. She told the AHRS representative that interviewed her that "I want you to be informed that I cannot work Friday sundown to Saturday sundown." She also testified that she informed Oscar, her supervisor in the junior associates program, about her religious beliefs. Ex. A, [63:5-65:20].

15. In or around October 2020, when Legros was in her application processing role, someone new handled scheduling her to work. According to Legros, this assistant scheduled her to work on Saturdays because of an alleged requirement to work on the weekend. Legros reminded her that she could not work on the Sabbath, but she was allegedly scheduled on Saturday, anyhow. Ex. A, [66:14-68:5].

16. Legros did not produce any evidence to support this claim that she was scheduled on Saturday. Once Legros told the scheduling assistant she was unable to work Saturdays because of her Sabbath unavailability, the assistant removed Saturday from the schedule. When changes were made in the scheduling platform, the old schedule would be deleted and only reflect the updated schedule. Ex. A, [189:14-191:5].

17. Although Legros testified she was not scheduled on Fridays in retaliation for asserting her religious beliefs, she admitted that this error, if it occurred at all, was limited to only two to three weeks. Further, once she moved into her HR role under Sanchez in December 2020 or January 2021, her scheduling issues were cleared up. Ex. A, [67:19-68:16; 72:4-11].

18. More importantly, even if she was scheduled to work on her Sabbath, Legros admitted she could not recall a single instance where she worked past sundown on Friday or prior to sundown on Saturday. Put plainly, Legros never worked on her Sabbath in violation of her religious beliefs. Ex. A, [69:5-20].

19. Legros also was completely unaware of any of her coworkers' religious beliefs. She testified that because she worked in a Zoom environment, she did not have time to socialize with her coworkers and to understand their backgrounds and experiences. In fact, she testified she was not aware of anyone being treated better than she was based on their religious backgrounds. Ex. A, [122:20-124:9].

20. On or about July 14, 2021, Legros was involved in a motor vehicle accident that occurred after working hours. She texted Sanchez that night, letting her know about the accident and sending pictures from the scene. By way of interrogatory, Legros generally described neck, shoulder, and hips injuries resulting from the motor vehicle accident. Ex. A, [124:25-125:14; 127:17-128:7]; Verified Answers to Interrogatories # 4, attached as Exhibit B.

21. Legros did not tell Sanchez very much about her physical condition. She only told Sanchez that she could not sit or stand for very long because her neck and shoulders were hurting, and she was in pain. Legros "didn't really disclose a lot of her medical information" to AHRS management because she "tried not to be so personal at work." Even so, Legros' coworkers were "very empathetic, very understanding" of the pain she had. Ex. A, [128:8-22; 138:10-23; 144:16-145:1].

22. After the accident, Legros told Sanchez she would need "a high desk and things for her chair" because "her back was killing her." However, she never requested these items from anyone at AHRS, not even Sanchez. Instead, she decided to buy them herself. Moreover, she never told anyone at AHRS other than Sanchez that she even needed these items, let alone requesting AHRS to buy them for her. Ex. A, [162:4-15].

23. Legros was examined by Dr. Russell Turner, D.C., on July 20, 2021. He noted in his initial examination report that Legros was not transported to the hospital following her accident. Dr. Turner noted injuries to Legros' neck, shoulders, and back, and set forth a treatment plan to start with a physical therapy regimen 3-4x per week, beginning on her next visit. Ex. B, # 5; LEGROS 25-28, attached as Exhibit C.

24. Following the July 20 visit, Dr. Turner provided a doctor's note to Legros, which stated, "No work from 7/14/2021 thru 7/22/2021 with a late arrival to work today. ***She is able to return to work this afternoon***. This is due to injuries sustained in [the motor vehicle accident]." Legros, in turn, provided this note to Sanchez by email on July 21, 2021. Although she promised to provide a weekly note regarding her physical therapy, she did not do so. Ex. A, [128:23-129:20]; LEGROS 29, attached as Exhibit D; AHRS 203-206, attached as Exhibit E.

25. Legros was unable to identify her disability or any disabling condition she needed leave for. She only knew what the "long term ailments *would have been*" from her motor vehicle accident, but "[she didn't] know if [she] would consider that to be a disability." She never informed anyone at AHRS in writing that she had some kind of disability. Further, she never had any conversation with anyone at AHRS about whether they considered Legros to be disabled. Ex. A, [132:5-133:7; 134:22-135:10; 144:16-145:1].

26. Legros was not aware whether anyone else on her team at AHRS had a disability. She was also not aware whether anyone received better treatment than her for their disabling conditions. Ex. A, [144:2-4; 146:18-24].

27. Further, Legros could not identify a major life activity in which she was substantially limited. Legros testified that she could only stand or sit for "30 to 40 minutes" before needing to switch positions. Though she testified about a diminished capacity to sit or stand for long periods of time, she did not testify about an utter inability to perform *any* major life activity, including sitting or standing. Ex. A, [136:3-11].

28. Legros was not yet eligible for FMLA leave on all of July 14, 20, and 21, 2021. She was not eligible for FMLA leave until July 28, 2021, twelve months after she was hired. Legros did not apply for FMLA leave, nor even request any information on the FMLA, on July 29, 30, or August 2, 2021, nor did she tell anyone she intended to apply for the FMLA. Had she done so, Legros would have applied for FMLA leave for her own injuries. Ex. A, [129:14-131:16; 145:12-146:17; 147:18-148:12].

29. Even with her injuries, Legros admitted she was able to perform the essential functions of her job. She needed a standing desk and chair pillows to do so, but she supplied those items herself. In fact, she testified she was going to get those items for herself, regardless of whether AHRS would provide them for her. Further, Legros testified she did not tell anyone other

than Sanchez about her need for a standing desk or chair pillows. Legros did not explicitly or implicitly communicate to Sanchez—the only person she told about the standing desk and chair pillows—that she believed she was being discriminated against due to her alleged disability. Ex. A, [137:1-138:9; 144:11-15; 162:4-15; 162:16-163:13].

30. On August 2, 2021, Legros was called into Oscar's Zoom room by Sanchez. In that meeting, Legros was terminated. She was simply told that her services were no longer needed. Ex. A, [148:13-149:21].

31. Legros was terminated in part due to her inconsistent attendance. AHRS' time records show that Legros missed extended hours in the middle of the workday several times. Other than the July 20 note, she did not provide any justification for these extended absences. As some examples of her inconsistent attendance:

   a. On July 20, 2021, Legros clocked out from 11:29 a.m. until 2:46 p.m.
   b. On July 23, Legros clocked out from 11:58 a.m. until 3:13 p.m.
   c. On July 28, Legros did not work at all.
   d. On July 29, Legros clocked out from 12:04 p.m. until 3:19 p.m., clocked back in, and then did not clock out again until 9:08 a.m. the next day.
   e. On July 30, Legros did not clock in until 2:00 p.m. and clocked out at 2:30 p.m.
   f. On August 2, Legros texted Sanchez at 10:30 a.m. to state that she would not be in that day.

Ex. A, [128:23-129:20]; AHRS 191-199, attached as Exhibit F; LEGROS 0001, attached as Exhibit G.

32. Legros testified that the actions she felt were discriminatory based on her religion were taking her off the schedule for some Fridays and cutting her short on hours. However, she admitted this scheduling issue lasted only 2-3 weeks and did not occur after she was placed in HR. She also felt that AHRS "made it complicated to use PTO" when her child was sick, but she did not connect this to her religion, specifically. Ex. A, [67:19-68:16; 72:4-11; 157:5-159:24].

33. Legros testified that the actions she felt were discriminatory based on her disability—to the extent she had a disability at all—was that "they had a hard time allowing me to go to [the] chiropractor" and that they did not provide her with a standing desk or chair pillow. However, she admitted she never asked anyone at AHRS for a standing desk or chair pillow. Ex.

A, [161:13-163:19].

34. Further, Legros testified that, in relation to her disability discrimination claim, AHRS failed to provide her with more working hours to make up for her need to attend physical therapy. In fact, AHRS could not give Legros any added hours due to her position in HR, since, in Legros' own words, "if Carmel left for the day or Natalie left for the day, there was not much for me to do." Ex. A, [167:13-22].

35. When she was hired, Legros received an employee handbook from AHRS. She "skimmed" the policies in the handbook. Inside the handbook were detailed policies related to the FMLA and non-discrimination. However, she specifically denied reviewing the section on the FMLA. Instead, she "went to Google university" to learn about the FMLA because she assumed the FMLA was "standard across the board for all companies in Florida." Ex. A, [168:18-169:13; 172:5-174:20]; Employee Handbook, attached as Exhibit H.

Dated:  November 9, 2023
        Boca Raton, FL

Respectfully submitted,

**Alex B.C. Ershock**
ROBIN I. FRANK, ESQ.
Florida Bar No. 0649619
E-Mail:  RIF@PBL-Law.com
ALEX B.C. ERSHOCK, ESQ.
Florida Bar No. 100220
E-Mail:  ABE@PBL-Law.com
PADULA BENNARDO LEVINE, LLP
3837 NW Boca Raton Blvd., Suite 200
Boca Raton, FL   33431
Telephone:    (561) 544-8900
Attorneys for Defendant